UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MEREDITH TRAINOR, individually and on behalf of her infant child, S.P.,

Plaintiffs,

-against-

CITY OF NEW YORK; NATASHA WILLIAMS, in her individual capacity; and CHRISTINE SPENCE, in her individual capacity,

Defendants.

**COMPLAINT AND
JURY TRIAL DEMAND**

Case No. 1:26-cv-1566

Plaintiff Meredith Trainor, on behalf of herself and her infant daughter S.P., by and through her attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, alleges as follows for her complaint:

**NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES
WRONGFULLY REMOVES
11-MONTH-OLD CHILD FROM HER "AMAZING" MOTHER**

1. In January 2024, Plaintiff S.P. was a happy and playful eleven-month-old baby who was closely bonded with her mother, Plaintiff Meredith Trainor.

2. Despite overwhelming evidence that S.P. was safe, loved, and supported in Ms. Trainor's care, Defendants Natasha Williams and Christine Spence, caseworkers from the New York City Administration for Children's Services ("ACS"), forcibly removed S.P. from Ms. Trainor's custody without a court order and without Ms. Trainor's consent.

3. S.P. cried and screamed out "mama" when Defendant Williams took S.P. from Ms. Trainor's arms.

4. Defendants unlawfully separated Ms. Trainor and S.P. for five days and subjected Ms. Trainor to baseless neglect proceedings for the next eight months based solely on

an incident that occurred while Ms. Trainor was at work and S.P. was in her father's care.

5. On December 31, 2023, five days before Defendants unlawfully seized S.P. from Ms. Trainor, S.P.'s father took S.P. to the hospital, where she was diagnosed with opiate ingestion. The hospital provided S.P. with medication and released S.P. to Ms. Trainor's care that same day.

6. Just after midnight on January 1, 2024, ACS caseworkers arrived at Ms. Trainor's home to remove S.P. from the custody of her father. ACS removed him from the home and ordered him to stay away from S.P. During that home visit, ACS identified no concerns regarding Ms. Trainor's ability to care for S.P.

7. Over the next four days, S.P. remained safely in Ms. Trainor's care. Ms. Trainor ensured that S.P.'s father complied with ACS's no-contact directives.

8. ACS interviewed several people who knew Ms. Trainor and S.P. None of them identified concerns about Ms. Trainor's parenting. Ms. Trainor's childcare provider described Ms. Trainor as an "amazing" mother.

9. On January 2, 2024, Defendant Williams visited Ms. Trainor's home for a second time and again identified no safety concerns for S.P. in Ms. Trainor's care.

10. Yet, on January 4, 2024, Defendant Williams, with approval from Defendant Spence, forcibly seized S.P. from Ms. Trainor's care without a court order and without Ms. Trainor's consent.

11. Ms. Trainor did not know where ACS was taking S.P.; she was overcome with panic.

12. The next day, January 5, 2024, ACS filed a neglect petition against Ms. Trainor in Queens County Family Court.

13. For the next five days, ACS kept custody of S.P. until the Queens County Family Court ordered S.P. immediately released to Ms. Trainor's custody after a hearing at which the Family Court concluded the emergency removal was unnecessary.

14. S.P. has remained safely in the custody of Ms. Trainor ever since.

15. Ms. Trainor, on behalf of herself and S.P., now brings this action to hold Defendants accountable for violating her and S.P.'s constitutional rights by interfering with S.P. and Ms. Trainor's right to intimate association and child custody without probable cause and due process of law, subjecting S.P. to unlawful seizure and false imprisonment, and subjecting Ms. Trainor to malicious prosecution.

## THE PARTIES

16. Plaintiff Meredith Trainor is a citizen of the United States. She is 33 years old and currently resides in Bronxville, New York. She is the mother of S.P.

17. When the events that form the basis of this lawsuit occurred, Ms. Trainor lived in Queens, New York.

18. S.P. is a citizen of the United States. She is three years old and currently resides in the sole custody of her mother, Ms. Trainor, in Bronxville, New York.

19. When the events that form the basis of this lawsuit occurred, S.P. lived in Queens, New York.

20. Defendant Natasha Williams was, at all times relevant to this Complaint, a caseworker with ACS employed by the City of New York. In this role, Defendant Williams was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, she was acting within the scope of her employment and under color of state law.

21. Defendant Christine Spence was, at all times relevant to this Complaint, a caseworker supervisor with ACS employed by the City of New York. In this role, Defendant Spence was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York. At all relevant times, she was acting within the scope of her employment and under color of state law.

22. Defendant City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by the State of New York to maintain the ACS, the City agency responsible for investigating and prosecuting allegations of child abuse and neglect. At all times relevant hereto, the City, acting through ACS, was responsible for the policies, practices, supervision, implementation, and conduct of all ACS matters, including the appointment, training, supervision, and conduct of all ACS personnel. In addition, at all relevant times, the City was responsible for enforcing the rules of ACS and for ensuring that ACS personnel, including Defendants Williams and Spence, obey the laws of the United States and of the State of New York.

## JURISDICTION AND VENUE

23. This action arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988.

24. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

25. The acts complained of occurred in the Eastern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

26. Plaintiffs demand trial by jury.

4

## FACTUAL ALLEGATIONS

27. Plaintiff Meredith Trainor is the mother of three-year-old S.P. and a one-year-old boy, L.P.

28. Ms. Trainor lives with S.P. and L.P. in Bronxville, New York. She has sole custody of both children.

29. Ms. Trainor works as a psychiatric social worker at a hospital in Westchester County, New York.

30. On January 4, 2024, ACS seized Ms. Trainor's then-eleven-month-old daughter S.P. out of her arms. Despite overwhelming evidence that S.P. was safe, loved, and supported in her mother's care, ACS took S.P. into its custody without a court order and without Ms. Trainor's consent.

31. ACS kept custody of S.P. for the next five days, until a Family Court judge ordered ACS to return S.P. to Ms. Trainor's care.

32. At the time ACS seized S.P. from Ms. Trainor's custody, S.P. was exclusively breastfed by Ms. Trainor.

33. Ms. Trainor was pregnant with L.P. at the time that ACS seized S.P.

*The December 31, 2023 Incident Involving S.P.'s Father and S.P.*

34. On December 31, 2023, S.P.'s father had S.P. in his care during Ms. Trainor's workday.

35. While solely in her father's care that day, S.P. became short of breath.

36. S.P.'s father called Ms. Trainor, who recommended that he take S.P. to the emergency room at Cohen Children's Medical Center in Queens, New York.

37. S.P. arrived at Cohen Children's Medical Center at around 1:00 P.M. that

day.

38.  S.P.'s father notified Ms. Trainor when they were at the hospital.

39.  Ms. Trainor immediately left her job in Westchester County to travel to the hospital in Queens to be with S.P.

40.  At the hospital, S.P. was diagnosed with opiate ingestion and provided with medication to reverse the effects.

41.  Medical records from the hospital on December 31, 2023 reflect that the hospital completed a child abuse screen and reported no concerns of physical abuse and no findings "that might reflect poor supervision, care, nourishment or hygiene."

42.  The hospital monitored S.P. for several hours before discharging S.P. to Ms. Trainor's care at around 8:45 P.M. that evening.

43.  A hospital progress note from around the time of S.P.'s discharge indicates that results for a urine toxicology panel on S.P. came back positive for cocaine. S.P.'s doctor "discussed" this result with the social worker and "spoke to ECS who was going to the home to investigate."[1]

44.  According to ACS, the doctor reported that S.P.'s "parents['] interaction was positive towards each other and the child," that Ms. Trainor "was fine," and the doctor "discharged [S.P.] to her."

45.  Hospital staff identified no concerns about Ms. Trainor's ability to parent S.P.

---

[1] "ECS" refers to Emergency Children's Services, a division of ACS which conducts child maltreatment investigations outside of normal business hours.

*Family History Assessment Identifies No Risks to S.P. in Ms. Trainor's Care.*

46. On December 31, 2023, ACS assessed the narrative notes from that day's events and conducted research based on the family's history, raising no significant concerns. For example,

a. The Intake Report documented that the family had no prior history with the Statewide Central Register of Child Abuse and Maltreatment ("SCR");

b. The Intake Report documented no involvement or history with the Child Advocacy Center ("CAC") for child abuse and neglect;

c. The Intake Report stated that "based upon the assessment of the narrative of the Initial Report of Involvement there are no concerns regarding Domestic Violence therefore a consultation was not requested;" and

d. The Intake Report stated that "based upon the assessment of the narrative of the Initial Report of involvement there are no concerns regarding Mental Health therefore a consultation was not requested."

47. Ms. Trainor has no history of addiction or substance abuse.

48. Although S.P.'s father had a history of substance abuse before he and Ms. Trainor began their relationship, as of December 31, 2023, Ms. Trainor neither knew nor had reason to know that S.P.'s father had used drugs during the four years of their relationship.

***ACS Removes S.P.'s Father from the Home and Determines that S.P. Is Safe and Well-Cared for in Ms. Trainor's Custody***

49. Shortly after midnight on January 1, 2024, ACS caseworkers arrived at Ms. Trainor's home to conduct a home visit.

50. At that time, ACS had already spoken to the medical staff and was aware that S.P. had cocaine in her system.

51. Upon entering and after introducing herself, Ms. Trainor "asked if [CPS] was removing the child" and "CPS told her no and for her not to worry."

52. ACS Caseworker Myrna Brown conducted a safety assessment of the home describing no safety concerns. She documented that Ms. Trainor's 2-bedroom, 1-bathroom home was "clean, organized and presented with no safety concerns."

53. Caseworker Brown observed that S.P. "has a room with a crib, changing table, diapers, books and toys. The crib was empty and CPS commented that the BM is aware of Safe Sleep. The home has a smoke detector and ample food to compliment the breastfeeding. CPS noticed the family had a Xmas tree and guards on the windows."

54. Caseworker Brown interviewed S.P.'s father alone about what happened to S.P., and inquired about his history of substance use, and his employment status. Caseworker Brown informed S.P.'s father that the police were on the way to speak to him.

55. Caseworker Brown then interviewed Ms. Trainor separately, while she breastfed S.P.

56. Caseworker Brown informed Ms. Trainor that cocaine was found in S.P.'s system and inquired about Ms. Trainor's support system. Caseworker Brown again reassured Ms. Trainor, "asking [Ms. Trainor] not to worry as she is pregnant and there's no need for the added stress."

57. Caseworker Brown then asked S.P.'s father if he had somewhere to stay for the evening and made a removal of S.P. *only as to S.P.'s father*. Accordingly, Caseworker Brown instructed S.P.'s father to leave the home and stay away from S.P. until further notice.

58. ACS identified no immediate threat to S.P.'s health or safety in Ms. Trainor's care, and expressed no concerns about Ms. Trainor's ability to parent S.P.

59. ACS placed no restrictions on Ms. Trainor, in whose care and custody S.P. remained after ACS removed S.P.'s father from the home.

60. NYPD officers also came to the apartment and arrested S.P.'s father. The charges against him were later dropped.

61. Upon information and belief, there is no record of the police having any concerns regarding Ms. Trainor or S.P. in Ms. Trainor's custody.

62. Ms. Trainor ensured that S.P.'s father complied with ACS's no-contact directives. She did not permit S.P.'s father to return to the home or see S.P. after ACS removed him from the home.

### S.P. Remains Safely in Ms. Trainor's Custody for the Next Four Days

63. For the next four days, from January 1 to January 4, 2024, S.P. remained safely in Ms. Trainor's care and custody without incident.

64. ACS employee Valerie Jean-Louis conducted a "Supervisor/Managerial Review" of the case on January 1, 2024, documenting that the safety plan was for S.P. "to remain in the care of the mother, Meredith Trainor."

65. On January 2, 2024, ACS worker and District Attorney Laison Leslie Tio-Luna reviewed the case and similarly reported no concerns about leaving S.P. in Ms. Trainor's care and custody, determining instead that a "joint visit is not warranted at this time since ECS CPS and the detective conducted a joint visit and the father was arrested."

66. On January 2, 2024, Defendant Williams contacted S.P.'s father to discuss what happened to S.P. in his care. Williams informed S.P.'s father that he would need to undergo random drug screening and explained that he needed to continue staying away from S.P. until a court hearing.

67. Also on January 2, 2024, at around 8:00 P.M., Defendant Williams conducted a second home visit and spoke to Ms. Trainor in person about what happened to S.P. in S.P.'s father's care.

68. Defendant Williams found no mental health, medical, substance abuse, domestic violence issues or concerns about Ms. Trainor, concluding "[n]o safety concerns in the home."

69. Defendant Williams identified no immediate threat to S.P.'s health or safety, and expressed no concerns about Ms. Trainor's ability to parent S.P.

70. Like ACS Caseworker Myrna Brown, Defendant Williams assessed the home and S.P.'s safety in Ms. Trainor's care and custody.

71. Defendant Williams documented that the "child['s] room has a crib, a changing tabl[e], toys and appropriate clothes. The home has a working carbon smoke detector. The home has running hot and cold water and heat for the winter weather. The home has adequate food supply."

72. Defendant Williams also reported that she "did not observ[e] any safety concerns for the home environment," and concluded the progress note by again reiterating that there were "no safety concerns in the home."

73. Defendant Williams observed S.P. happy, playful, and closely bonded with her mother. Defendants Williams watched S.P. playing with toys, smiling, saying "Mama," and breastfeeding. She observed a "good mother and child bond," including observing that Ms. Trainor "engages well with the child attending to wants," S.P. appears "comforted" when Ms. Trainor picked her up, and that Ms. Trainor can "differentiate between the types and tones of cries and recognized what each cry expresses."

10

*Additional ACS Interviews Confirm that Ms. Trainor Is an Excellent Mother*

74. On January 3, 2024, Defendant Williams spoke with S.P.'s childcare provider, which S.P. attended five days per week. S.P.'s childcare provider reported to Defendant Williams that Ms. Trainor, who regularly dropped off and picked S.P. up from daycare, is "an amazing person and very involved in [S.P.'s] well-being." The provider reported that S.P. is "always a happy baby" and "reported no concerns for the child in the mother's care."

75. Defendant Williams also contacted a relative on January 3, 2024. That relative similarly reported that Ms. Trainor is a "great mother and she would never cause any intentional harm" to S.P. The relative similarly had "no concerns."

76. Defendant Williams then contacted the social worker at the hospital, who confirmed that she spoke with Ms. Trainor alone and that Ms. Trainor appeared "appropriate." She further confirmed that the hospital discharged S.P. to Ms. Trainor and reported no concerns about Ms. Trainor's ability to care for S.P.

77. These interviews confirmed that S.P. was safe and well-cared for in Ms. Trainor's care.

78. Defendant Williams identified no immediate threat to S.P.'s health or safety.

*Defendants Forcibly Remove S.P. from Ms. Trainor's Care on January 4, 2024, Despite Clear Evidence that S.P. was Safe and Well-Cared for in Ms. Trainor's Custody*

79. At approximately 8:00 P.M. on January 4, 2024, Defendant Williams came to Ms. Trainor's apartment without advance notice, forcibly seized S.P. from Ms. Trainor's care, and took S.P. into ACS custody without Ms. Trainor's consent or a court order authorizing the seizure.

80. Defendant Williams provided Ms. Trainor no clear reason why she was

seizing S.P. from her care.

81. Defendant Spence approved ACS's emergency removal of S.P. from Ms. Trainor.

82. Neither Defendant Williams nor Defendant Spence sought or secured a court order to remove S.P. from Ms. Trainor's custody.

83. Neither Defendant Williams nor Defendant Spence sought or secured Ms. Trainor's consent to remove S.P. from her custody.

84. Defendant Williams, knowing Ms. Trainor was pregnant at the time of the removal, threatened Ms. Trainor with the future removal of her unborn son if she did not comply with ACS's directives, including the removal of S.P. that evening.

85. S.P. cried, screamed "mama," and reached out to her mother as Defendant Williams forcibly seized S.P. from her mother's arms.

86. Defendant Williams documented S.P.'s "crying and screaming and reaching for her mother" when she took S.P. from Ms. Trainor.

87. Ms. Trainor was distraught, "crying and begging" Defendant Williams not to take S.P.

88. Defendant Williams' case progress note describes how Ms. Trainor "kept asking about where the child will be, who will be watching her, if the child will be sleeping in her own bed."

89. Defendant Williams also noted Ms. Trainor's concern that S.P. was exclusively breastfed and ACS was taking her without breastmilk. Ms. Trainor begged Defendant Williams to let her at least nurse S.P. before they took her and for her to take pumped milk. Defendant William refused these requests.

90. After ACS took S.P. from Ms. Trainor's home, Ms. Trainor could still hear S.P. down the block screaming and crying for her.

91. Defendant Williams transported the eleven-month-old S.P. to a facility in the Bronx, where ACS held her overnight.

92. Ms. Trainor did not know where S.P. was that night or whether she was safe. After S.P. was seized, Ms. Trainor physically collapsed in front of a neighbor, who overheard what happened.

93. With no information about S.P.'s safety and whereabouts, Ms. Trainor stayed up helpless and in fear all night, unable to sleep as she replayed the events of the evening and imagined what might be happening to S.P.

94. On January 5, 2024, S.P. was placed in the temporary physical custody of her maternal uncle, where she remained until January 9, 2024.

95. Between January 5 and 9, 2024, Ms. Trainor could only see S.P. during the day with S.P.'s maternal uncle supervising the visits at all times. Ms. Trainor was not permitted to spend the night with S.P.

***ACS Files a Baseless Petition against Ms. Trainor***

96. The day after S.P.'s seizure, on January 5, 2025, ACS filed a neglect petition against Ms. Trainor in Queens County Family Court.

97. Upon information and belief, the neglect petition was verified by Defendant Williams.

98. Upon information and belief, Defendant Spence approved and authorized Defendant Williams' verification of the neglect petition.

99. The allegations in the neglect petition pertained solely to S.P.'s positive

13

drug test she had at a time when she was in her father's care, and not in Ms. Trainor's care.

100. For five days, from January 4 to January 9, 2024, S.P. remained in ACS custody—not her mother's custody—pending a hearing in the Queens County Family Court about the emergency removal.

***The Queens County Family Court Orders S.P. Returned to Ms. Trainor's Custody***

101. On January 9, 2024, the Queens County Family Court held a hearing regarding the emergency removal.

102. At the conclusion of the hearing, the Family Court found that removal was not necessary to avoid imminent risk to the child's life or safety and ordered S.P. released to Ms. Trainor's custody.

103. S.P. has remained safely in Ms. Trainor's custody ever since.

104. On September 6, 2024, the Queens County Family Court dismissed the neglect petition ACS filed against Ms. Trainor.

105. On November 11, 2024, Ms. Trainor filed a custody petition in the Queens County Family Court, seeking full custody of S.P. and her son L.P. from their father.

106. On January 10, 2025, the Queens County Family Court awarded Ms. Trainor full custody of S.P. and L.P.

***Ms. Trainor and S.P. Suffer Lasting Physical and Emotional Damage***

107. Ms. Trainor has experienced physical and psychological distress because of Defendant's unlawful removal of S.P. and malicious and baseless prosecution for neglect.

108. Since January 2024 and continuing through today, Ms. Trainor has experienced anxiety, fear, hypervigilance, difficulty sleeping, and nightmares as a result of Defendants' removal of S.P. and the wrongful neglect petition brought against her.

14

109. Eleven-month-old S.P. exhibited visible signs of distress as a result of being separated from her mother.

***Ms. Trainor Files a Notice of Claim***

110. On April 2, 2025, Ms. Trainor sought leave from the Supreme Court of the State of New York, pursuant to New York General Municipal Law § 50-e(5), to file a late notice of claim for all state and local claims against the City of New York and the Individual Defendants.

111. The Supreme Court granted Ms. Trainor's petition for leave to file a late notice of claim on July 17, 2025.

***Defendant City of New York's Widespread Abuse of Emergency Removals***

112. In each of the last three years, ACS has removed over 1,390 children from the custody of their parents on an emergency basis without a court order.[2]

113. Overall, ACS lacks a court order to support their removal of children from parents in approximately half of the child removals that the agency conducts.[3]

114. To conduct an emergency removal without a court order, there must be such imminent danger of harm to the child in the parent's care that there is no time to obtain a court order to authorize the removal.

115. The New York City Council has found that 27% of the emergency

---

[2] N.Y.C. Admin. for Children's Servs., Annual Report CY 2025, at 17 (2025), https://www.nyc.gov/assets/acs/pdf/data-analysis/2025/CityCouncilReportCY2025.pdf; N.Y.C. Admin. for Children's Servs., Annual Report CY 2024, at 17 (2024), https://www.nyc.gov/assets/acs/pdf/data-analysis/2024/CityCouncilReportCY2024.pdf; N.Y.C. Admin. for Children's Servs., Annual Report CY 2023, at 17 (2023), https://www.nyc.gov/assets/acs/pdf/data-analysis/2023/CityCouncilReportCY2023.pdf.

[3] N.Y.C. Admin. for Children's Servs., Flash Report Monthly Indicators, at 13 (Dec. 2025), https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2025/12.pdf.

removals ACS conducts each year "are not approved at initial hearings in Family Court," [4]

meaning that the Family Court determines there is no imminent danger of harm to the child in

the parent's care.

116.    Applying this statistic to the approximately 1,400 emergency removals

ACS conducts each year, Family Courts in New York City find that approximately 375

emergency removals each year are not justified by imminent danger of harm to the child in their

parent's care.

117.    An internal audit commissioned by ACS that included interviews with

more than fifty ACS caseworkers found that a "culture of fear" in the agency "incentivized the

removal of children, positioning CPS staff as detectives looking for reasons to remove children,

rather than as social workers aiming to support families." The audit found, "Fundamentally,

internal and external pressures drive staff to seek removal as a first course of action, to cover the

reputation of staff, internally, and ACS, externally."[5]

118.    On information and belief, ACS has not changed the way that it trains or

supervises its caseworkers about emergency removals in response to the audit.

119.    On information and belief, ACS has not changed its policies or practices

regarding emergency removals in response to the audit.

120.    At least seven lawsuits, including four filed in the last four years, allege

---

[4] The City Council of New York, *Report of the Finance Division on the Fiscal 2021 Preliminary Financial Plan, Fiscal 2021 Preliminary Capital Budget, Fiscal 2021 Preliminary Capital Commitment Plan, and the Fiscal 2020 Preliminary Mayor's Management Report for the Administration for Children's Services*, at 22, 41 (Mar. 23, 2020), https://council.nyc.gov/budget/wp-content/uploads/sites/54/2020/04/068-ACS.pdf.

[5] Nat'l Innovation Servs., *DRAFT: New York City Administration for Children's Services Racial Equity Participatory Action & System Audit: Findings and Opportunities*, at 21 (Dec. 2020), https://www.bronxdefenders.org/wp-content/uploads/2022/11/DRAFT_NIS_ACS_Final_Report_12.28.20.pdf.

that ACS seized children from their parents' custody without a court order and without probable cause to believe that the child was in such imminent danger in their parents' care that there is no time to obtain a court order to authorize the removal. The City of New York settled all four of the lawsuits filed in the last four years.

121. News reports document additional recent cases where ACS has seized children from parents without a court order and without probable cause to believe that the children are in such imminent danger in the parents' care that there is no time to obtain a court order to authorize the removal.[6]

**FIRST CAUSE OF ACTION**
42 U.S.C. § 1983 – First and Fourteenth Amendments
Interference with Right to Intimate Association
(Against Defendants Williams and Spence)

122. Plaintiffs repeat and reallege the above paragraphs as if they were fully set forth at length herein.

123. By reason of the foregoing, without any evidence of safety concerns in Ms. Trainor's home, without any history of mental health or substance abuse concerns by Ms. Trainor, and with strong collateral contacts affirming Ms. Trainor's competence as a mother, Defendants Williams and Spence removed and detained S.P. without a court order from the custody of Ms. Trainor, without probable cause and without due process of law.

124. Defendants Williams and Spence proceeded to initiate and continue the wrongful prosecution of Ms. Trainor by filing a baseless and unsupported petition in Family Court.

---

[6] *See, e.g.*, Karen Yi, *'You Never Think It Will Be You': NYC Child Welfare Removals Show Racial Bias, Per Report*, Gothamist (June 3, 2025), https://gothamist.com/news/you-never-think-it-will-be-you-nyc-child-welfare-removals-show-racial-bias-per-report.

125. Defendants Williams and Spence continued the wrongful separation and detention of S.P. in ACS custody, thereby interfering with the relationship between Ms. Trainor and S.P. without probable cause and due process of law.

126. By their conduct of removing and continuing to detain S.P. without probable cause and without due process, Defendants Williams and Spence unlawfully interfered with Ms. Trainor's liberty interest in the care and custody of her child, in violation of the First and Fourteenth Amendments to the United States Constitution.

127. By their conduct of removing and continuing to detain S.P. without probable cause and without due process of law, Defendants Williams and Spence unlawfully interfered with S.P.'s liberty interest in her mother's care and her right of intimate association with her mother, in violation of the First and Fourteenth Amendments to the United States Constitution.

128. Defendants Williams and Spence acted under pretense and color of state law. They acted in abuse of their powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Ms. Trainor and S.P. of their constitutional rights secured by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

129. As a direct and proximate result of Defendants Williams and Spence's misconduct detailed above, Ms. Trainor suffered the loss of the custody, companionship, and love of her child, and S.P. suffered the loss of love and companionship of her mother. Ms. Trainor also incurred expenses, and both Ms. Trainor and S.P. suffered humiliation, pain and suffering, terror, and mental anguish, all of which are ongoing.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Procedural Due Process
(Against Defendants Williams and Spence)

130.    Plaintiffs repeat and reallege the above paragraphs as if they were fully set forth at length herein.

131.    Ms. Trainor had a protected liberty interest in the care and custody of her child, S.P., under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

132.    By reason of the foregoing, without any evidence of safety concerns in Ms. Trainor's home, without any history of mental health or substance abuse concerns by Ms. Trainor, and with strong collateral contacts affirming Ms. Trainor's competence as a mother, Defendants Williams and Spence removed and detained S.P. without a court order from the custody of Ms. Trainor, without probable cause and without due process of law.

133.    Defendant Williams and Defendant Spence lacked any lawful basis for removing S.P. from the care and custody of Ms. Trainor.

134.    Defendants Williams and Spence acted under pretense and color of state law. They acted in abuse of their powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Ms. Trainor and S.P. of their constitutional rights secured by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

135.    As a direct and proximate result of Defendants Williams and Spence's misconduct detailed above, Ms. Trainor suffered the loss of the custody, companionship, and love of her child, and S.P. suffered the loss of love and companionship of her mother. Ms. Trainor also incurred expenses, and both Ms. Trainor and S.P. suffered humiliation, pain and

19

suffering, terror, and mental anguish, all of which are ongoing.

**THIRD CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Unlawful Seizure
(By Plaintiff S.P. Against Defendants Williams and Spence)

136. Plaintiffs repeat and reallege the above paragraphs as if they were fully set forth herein.

137. S.P. had a protected liberty interest to be free from unlawful seizure and detention under the Fourth and Fourteenth Amendments to the Constitution.

138. By reason of the foregoing, without any evidence of safety concerns in Ms. Trainor's home, without any history of mental health or substance abuse concerns by Ms. Trainor, and with strong collateral contacts affirming Ms. Trainor's competence as a mother, Defendants Williams forcibly removed S.P. from her mother's arms on January 4, 2024 and detained S.P. in ACS custody without a court order, without probable cause, and without due process of law.

139. Defendant Spence approved ACS's emergency removal of S.P. from Ms. Trainor's care.

140. Defendants Williams and Spence's seizure of S.P. constituted an unlawful seizure under the Fourth Amendment to the United States Constitution.

141. Defendants Williams and Spence acted under pretense and color of state law. They acted in abuse of their powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive S.P. of her constitutional rights secured by 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

142. As a direct and proximate result of Defendants Williams and Spence's misconduct detailed above, S.P. suffered the loss of love and companionship of her mother,

20

humiliation, pain and suffering, terror, and mental anguish, all of which are ongoing.

**FOURTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Malicious Prosecution
(By Plaintiff Trainor Against Defendants Williams and Spence)

143. Plaintiffs repeat and reallege the above paragraphs as if they were fully set forth at length herein.

144. Defendants Williams and Spence maliciously and without justification commenced child abuse and neglect proceedings against Ms. Trainor in Family Court, and continued such proceedings based upon no evidence and false, unreliable assumptions for approximately eight months despite an absence of probable cause.

145. By reason of the foregoing, without any evidence of safety concerns in Ms. Trainor's home, without any history of mental health or substance abuse concerns by Ms. Trainor, and with strong collateral contacts affirming Ms. Trainor's competence as a mother, Defendants Williams and Spence removed and detained S.P. without a court order from the custody of Ms. Trainor, without probable cause and without due process of law.

146. On January 5, 2024, the day after forcibly removing S.P. from Ms. Trainor's care and custody, ACS filed a baseless neglect petition against Ms. Trainor in Queens Family Court.

147. Upon information and belief, Defendant Williams verified the neglect petition under Defendant Spence's supervision and with Defendant Spence's approval.

148. Defendants Williams and Spence filed neglect charges against Ms. Trainor falsely, maliciously, in bad faith, and without probable cause.

149. Defendants Williams and Spence acted with malice and knew or were deliberately and recklessly indifferent to the truth that they lacked probable cause to initiate

21

proceedings against Ms. Trainor, and that no reliable information suggested she endangered the welfare of her child.

150. No reasonable ACS worker would have believed there was probable cause to prosecute Ms. Trainor and remove her child under these circumstances.

151. On January 9, 2024, the Court ordered S.P. returned to Ms. Trainor's care because ACS failed to meet its burden of showing that S.P. was in imminent risk of harm in Ms. Trainor's care.

152. On September 6, 2024, the Queens County Family Court dismissed the neglect petition against Ms. Trainor.

153. Defendants Williams and Spence acted under pretense and color of state law. They acted in abuse of their powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Ms. Trainor of her constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

154. Defendants Williams and Spence's conduct was willful, wanton, and reckless.

155. As a direct and proximate result of Defendants Williams and Spence's misconduct detailed above, Ms. Trainor suffered the loss of the custody, companionship, and love of her child. Ms. Trainor also incurred expenses and suffered humiliation, pain and suffering, terror, and mental anguish, all of which are ongoing.

**FIFTH CAUSE OF ACTION**
42 U.S.C § 1983 – Municipal Liability under *Monell*
(Against Defendant City of New York)

156. Plaintiffs repeat and reallege the above paragraphs as if they were fully set

forth at length herein.

157. At all relevant times, Defendant City of New York, acting under color of state law and through ACS and its officials, employees, agents, servants, and/or representatives, has maintained a policy, custom, and/or practice of seizing children from the custody of their parents without a court order and without probable cause to believe that the children are in such imminent danger of harm in their parents' care that there is no time for ACS to obtain a court order authorizing the removal (the "Unconstitutional Emergency Removal Policy").

158. The acts complained of herein in conducting the emergency removal of Plaintiff S.P. from Plaintiff Meredith Trainor's care were carried out by ACS officials, employees, agents, servants, and/or representatives pursuant to the policies, customs, and/or practices of Defendant City of New York.

159. Defendant City of New York's Unconstitutional Removal Policy is so widespread and persistent that it practically has the force of law and is so manifest that it implies the constructive acquiescence of senior policy-making officials.

160. Defendant City of New York's Unconstitutional Emergency Removal Policy has directly and/or proximately caused the deprivation of Ms. Trainor's and S.P.'s constitutional rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution pursuant to 42 U.S.C. § 1983.

161. At all relevant times, Defendant City of New York, acting under color of state law and through ACS and its officials, employees, agents, servants, and/or representatives, has acted with deliberate indifference to Plaintiffs Meredith Trainor and S.P.'s constitutional rights because Defendant City of New York (a) knows to a moral certainty from ACS and City Council data that ACS conducts hundreds of emergency removals every year that Family Courts

do not approve, and (b) knows from the internal audit ACS commissioned and the numerous lawsuits filed against it alleging unlawful emergency removals that ACS conducts emergency removals that violate families' constitutional rights.

162. Defendant City of New York fails to provide adequate training and supervision to ACS caseworkers regarding parents' and children's constitutional rights in connection with emergency removals, despite knowing that ACS conducts over one thousand emergency removals each year.

163. The need for Defendant City of New York to provide more or better supervision and training regarding families' constitutional rights about the emergency removal of children without a court order is obvious because ACS conducts hundreds of emergency removals without a court order each year that Family Courts ultimately decline to approve. Still, Defendant City of New York has made no meaningful attempt to prevent or forestall ACS's continued unlawful emergency removals.

164. Defendant City of New York's failure to adequately train or supervise ACS caseworkers about families' constitutional rights in connection with emergency removals directly and/or proximately caused ACS caseworkers to conduct the unlawful emergency removal of S.P. from Ms. Trainor, depriving Plaintiffs of their rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution pursuant to 42 U.S.C. § 1983.

165. As a result of Defendant City of New York's conduct, Plaintiffs suffered the injuries hereinbefore alleged.

**SIXTH CAUSE OF ACTION**
Article I, Section 6 of the New York State Constitution
(Against All Defendants)

166. Plaintiffs repeat and reallege the above paragraphs as if they were fully set

forth at length herein.

167. Ms. Trainor had a protected liberty interest in the care and custody of her child, S.P., under Article I, Section 6 of the New York Constitution.

168. By reason of the foregoing, without any evidence of safety concerns in Ms. Trainor's home, without any history of mental health or substance abuse concerns by Ms. Trainor, and with strong collateral contacts affirming Ms. Trainor's competence as a mother, Defendants Williams and Spence removed and detained S.P. without a court order from the custody of Ms. Trainor, without probable cause and without due process of law.

169. Defendant Williams and Defendant Spence lacked any lawful basis for removing S.P. from the care and custody of Ms. Trainor.

170. Defendant City of New York, as employer of Defendants Williams and Spence, is responsible for this wrongdoing under the doctrine of *respondeat superior*.

171. As a direct and proximate result of Defendants Williams and Spence's misconduct detailed above, Ms. Trainor suffered the loss of the custody, companionship, and love of her child, and S.P. suffered the loss of love and companionship of her mother. Ms. Trainor also incurred expenses, and both Ms. Trainor and S.P. suffered humiliation, pain and suffering, terror, and mental anguish, all of which are ongoing.

**SEVENTH CAUSE OF ACTION**
Negligence Under New York Common Law
(Against All Defendants)

172. Plaintiffs repeat and reallege the above paragraphs as if they were fully set forth at length herein.

173. Defendants had a duty to act with reasonable care toward Ms. Trainor and S.P.

25

174. Under the same or similar circumstances, a reasonable, prudent, careful person should have anticipated that their conduct would cause an injury to Ms. Trainor and S.P.

175. By reason of the foregoing, without any evidence of safety concerns in Ms. Trainor's home, without any history or evidence of drug use by Ms. Trainor or presence of drug paraphernalia, without any history of mental health or substance abuse concerns, and with strong collateral contacts affirming Ms. Trainor's competence as a mother, Defendants Williams and Spence removed and detained S.P. without a court order from the custody of Ms. Trainor, without probable cause and without due process of law. As a result, Ms. Trainor and S.P. were unlawfully separated for five days and subjected to baseless neglect proceedings for approximately eight months.

176. Defendant City of New York, as employer of Defendants Williams and Spence, is responsible for this wrongdoing under the doctrine of *respondeat superior*.

177. Defendants' actions alleged herein constitute a gross breach of this duty of care and a gross deviation from accepted professional standards.

178. Defendants' conduct amounted to utter recklessness, was so wantonly negligent as to amount to conscious disregard for Ms. Trainor's and S.P.'s rights, demonstrated a high degree of moral culpability, was designed to oppress and injure, and evinced a conscious indifference to the effects of their actions, entitling Ms. Trainor and S.P. to an award of punitive damages.

179. As a direct and proximate result of Defendants Williams and Spence's misconduct detailed above, Ms. Trainor suffered the loss of the custody, companionship, and love of her child. S.P. suffered the loss of the love, security, and companionship of her mother. Ms. Trainor incurred expenses, and both Ms. Trainor and S.P. suffered humiliation, pain and

suffering, terror, and mental anguish, which are ongoing.

## EIGHTH CAUSE OF ACTION
Common Law False Imprisonment
(By Plaintiff S.P. Against All Defendants)

180. Plaintiffs repeat and reallege the above paragraphs as if they were set forth fully herein.

181. Defendants Williams and Spence intended to confine S.P. in the custody of Defendant City of New York. S.P. was aware of her confinement and did not consent to that confinement. S.P.'s confinement was not otherwise privileged or supported by probable cause.

182. Defendant City of New York, as employer of Defendants Williams and Spence, is responsible for this wrongdoing under the doctrine of *respondeat superior*.

183. As a direct and proximate cause of Defendants' actions, S.P. suffered the damages alleged herein.

184. Defendants' conduct toward S.P. was wanton, reckless, willful, malicious, and/or designed to oppress or injure her, entitling S.P. to an award of punitive damages.

185. As a direct and proximate result of Defendants Williams and Spence's misconduct detailed above, S.P. suffered the loss of the love and companionship of her mother, humiliation, pain and suffering, terror, and mental anguish, which are ongoing.

## NINTH CAUSE OF ACTION
Interference with Child Custody Under New York Law
(Against All Defendants)

186. Plaintiffs repeat and reallege the above paragraphs as if they were set forth fully herein.

187. By removing and detaining S.P. from Ms. Trainor, all Defendants unlawfully interfered with Ms. Trainor's custody of her child in violation of New York law.

27

188. By reason of the foregoing, without any evidence of safety concerns in Ms. Trainor's home, without any history or evidence of drug use by Ms. Trainor or presence of drug paraphernalia, without any history of mental health or substance abuse concerns, and with strong collateral contacts affirming Ms. Trainor's competence as a mother, Defendants Williams and Spence unlawfully interfered with Ms. Trainor's custody of her child in violation of New York law.

189. Defendant City of New York, as employer of Defendants Williams and Spence, is responsible for this wrongdoing under the doctrine of *respondeat superior*.

190. As a result of all Defendants' actions, Ms. Trainor suffered the loss of the custody, companionship, and love of her child, S.P. S.P. suffered the loss of the love and companionship of her mother. Ms. Trainor incurred expenses and both Ms. Trainor and S.P. suffered humiliation, pain and suffering, terror, and mental anguish, which are ongoing.

**TENTH CAUSE OF ACTION**
Common Law Malicious Prosecution
(By Plaintiff Trainor Against All Defendants)

191. Plaintiffs repeat and reallege the above paragraphs as if they were set forth fully herein.

192. Defendants Williams and Spence maliciously and without justification commenced child abuse and neglect proceedings against Ms. Trainor in Family Court, and continued such proceedings based upon no evidence and false, unreliable assumptions for approximately eight months despite an absence of probable cause.

193. By reason of the foregoing, without any evidence of safety concerns in Ms. Trainor's home, without any history or evidence of drug use by Ms. Trainor or presence of drug paraphernalia, without any history of mental health or substance abuse concerns, and with

28

strong collateral contacts affirming Ms. Trainor's competence as a mother, Defendants Williams and Spence removed and detained S.P. without a court order from the custody of Ms. Trainor, without probable cause and without due process of law.

194. On January 5, 2024, the day after forcibly removing S.P. from Ms. Trainor's care and custody, ACS filed a baseless neglect petition against Ms. Trainor in Queens County Family Court.

195. Upon information and belief, Defendant Williams under Defendant Spence's supervision verified the neglect petition.

196. Defendants Williams and Spence filed neglect charges against Ms. Trainor falsely, maliciously, in bad faith, and without probable cause.

197. Defendants Williams and Spence acted with malice, and knew or were deliberately and recklessly indifferent to the truth that they lacked probable cause to initiate proceedings against Ms. Trainor, and that no reliable information suggested she endangered the welfare of her child.

198. No reasonable ACS worker would have believed there was probable cause to prosecute Ms. Trainor and remove her child under these circumstances.

199. Defendant City of New York, as employer of Defendants Williams and Spence, is responsible for this wrongdoing under the doctrine of *respondeat superior*.

200. On January 9, 2024, the Court ordered S.P. returned to Ms. Trainor's care because ACS failed to meet its burden of showing that S.P. was in imminent risk of harm in Ms. Trainor's care.

201. On September 6, 2024, the Queens County Family Court dismissed the neglect petition against Ms. Trainor.

202. As a direct and proximate result of Defendants Williams and Spence's misconduct detailed above, Ms. Trainor suffered the loss of the custody, companionship, and love of her child, and S.P. suffered the loss of love and companionship of her mother. Ms. Trainor also incurred expenses, and both Ms. Trainor and S.P. suffered humiliation, pain and suffering, terror, and mental anguish, all of which are ongoing.

* * *

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages against Williams and Spence in an amount to be determined at trial;

c. Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d. Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
March 17, 2026

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: _____ /s _Max Selver_____
Max Selver
Katherine Rosenfeld
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiffs Meredith Trainor and S.P.*